✎AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |

IDA DiLORENZO, individually and on behalf of all
others similarly situated,

V.

AMERICAN EXPRESS, AMERICAN EXPRESS
(SEE ATTACHED RIDER FOR CONTINUATION)

## SUMMONS IN A CIVIL ACTION

CASE NUMBER:

**'09 CIV 1202**

TO: (Name and address of Defendant)

AMERICAN EXPRESS
200 Vesey Street
New York, New York 10285
(SEE ATTACHED FOR CONTINUATION)

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Stephen. J. Fearon, Jr., Esq.
SQUITIERI & FEARON, LLP
32 East 57th Street
12th Floor
New York, New York 10022

an answer to the complaint which is served on you with this summons, within _____20_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON                          FEB 1 0 2009

CLERK                                        DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me(1) | |
| NAME OF SERVER (PRINT) | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

   Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL   $0.00 |
|---|---|---|

## DECLARATION OF SERVER

   I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
                    Date                       *Signature of Server*


                                     _____
                                     *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

## RIDER TO SUMMONS

COMPENSATION AND BENEFITS COMMITTEE, AMERICAN EXPRESS BENEFITS
PLANS INVESTMENT COMMITTEE, AMERICAN EXPRESS EMPLOYEE BENEFITS
ADMINISTRATION COMMITTEE, AMERICAN EXPRESS RETIREMENT SAVINGS
PLAN INVESTMENT COMMITTEE, JAN LESCHLY, RICHARD A. McGINN, EDWARD D.
MILLER, ROBERT D. WALTER, PETER CHERNIN, VALERIA CHRISTENSEN

AMERICAN EXPRESS COMPENSATION AND BENEFITS COMMITTEE
c/o AMERICAN EXPRESS
200 Vesey Street
New York, New York 10285

AMERICAN EXPRESS BENEFITS PLANS INVESTMENT COMMITTEE
c/o AMERICAN EXPRESS
200 Vesey Street
New York, New York 10285

AMERICAN EXPRESS EMPLOYEE BENEFITS ADMINISTRATION COMMITTEE
c/o AMERICAN EXPRESS
200 Vesey Street
New York, New York 10285

AMERICAN EXPRESS RETIREMENT SAVINGS PLAN INVESTMENT COMMITTEE
c/o AMERICAN EXPRESS
200 Vesey Street
New York, New York 10285

JAN LESCHLY
c/o AMERICAN EXPRESS
200 Vesey Street
New York, New York 10285

RICHARD A. McGINN
c/o AMERICAN EXPRESS
200 Vesey Street
New York, New York 10285

EDWARD D. MILLER
c/o AMERICAN EXPRESS
200 Vesey Street
New York, New York 10285

ROBERT D. WALTER
c/o AMERICAN EXPRESS
200 Vesey Street
New York, New York 10285

PETER CHERNIN
c/o AMERICAN EXPRESS
200 Vesey Street
New York, New York 10285

VALERIA CHRISTENSEN
c/o AMERICAN EXPRESS
200 Vesey Street
New York, New York 10285

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

'09 CIV 1202

-----------------------------------------------------------x
IDA DiLORENZO, individually and on            :
behalf of all others similarly situated,       :
                                               :
                Plaintiff,                     :       Civil Action No.
                                               :
        -against-                              :
                                               :
AMERICAN EXPRESS, AMERICAN EXPRESS :
COMPENSATION AND BENEFITS           :
COMMITTEE, AMERICAN EXPRESS BENEFITS:
PLANS INVESTMENT COMMITTEE,          :
AMERICAN EXPRESS EMPLOYEE BENEFITS :
ADMINISTRATION COMMITTEE, AMERICAN :
EXPRESS RETIREMENT SAVINGS PLAN      :
INVESTMENT COMMITTEE, JAN LESCHLY,  :
RICHARD A. McGINN, EDWARD D. MILLER, :
ROBERT D. WALTER, PETER CHERNIN,     :
VALERIA CHRISTENSEN and JOHN DOES 1-10,:
                                               :
                Defendants.                    :
                                               :
-----------------------------------------------------------x

RECEIVED
FEB 10 2009
U.S.D.C. S.D.N.Y.
CASHIERS

## CLASS ACTION COMPLAINT FOR VIOLATIONS
## OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT ("ERISA")

Plaintiff Ida DiLorenzo ("Plaintiff"), individually and on behalf of a class of similarly

situated participants in and beneficiaries of the American Express Retirement Savings Plan,

formerly known as the American Express Incentive Savings Plan (the "Plan"), alleges the

following based upon the investigation of her counsel, and upon personal knowledge as to facts

pertaining to Plaintiff and on information and belief as to all other facts:

### NATURE OF THE ACTION

1.      This is a class action brought pursuant to § 502 of the Employee Retirement

Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132, against the Plan's

1

fiduciaries, who are and were responsible for the investment of the assets and the administration of the Plan between April 19, 2007 and the present (the "Class Period"). During the Class Period, the Plan's fiduciaries, including American Express Company ("AmEx" or the "Company") and certain of its officers, directors and employees, breached their fiduciary duties owed to the Plan's participants and beneficiaries (collectively, the "Participants"), causing the loss of millions of dollars of Participants' retirement savings.

2.      Throughout the Class Period, the Plan invested heavily in AmEx common stock or units in the American Express Company Stock Fund ("AmEx Stock") which was offered as one of the investment alternatives in the Plan.

3.      Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the Participants, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period, as is required by ERISA.

4.      In particular, Defendants offered AmEx common stock as an investment option when it was imprudent to do so because AmEx was exposed to significant financial losses as a result of declines in consumer credit and spending and weaker credit trends. As the Class Period progressed, AmEx's financial condition deteriorated to such a point that its financial viability was jeopardized and it was in dire need of billions of dollars in rescue money from the United States government.

5.      On November 10, 2008, because of its significant financial problems, the Company made the dramatic move of becoming a licensed bank-holding company and received more than $3 billion in bailout money from the government.

2

6.      Defendants offered AmEx stock as an investment option and caused the Plan to hold, and the Plan's Participants to acquire, AmEx common stock when it was imprudent to so.

7.      As a result of Defendants' fiduciary breaches, the Plan has suffered substantial losses, resulting in lost profits and the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's Participants.

8.      During the Class Period, AmEx Stock traded at more than $58.00 per share but, following the disclosure of AmEx's financial problems, the stock has dropped to trade at less than $18 per share, taking with it the value of the vested retirement benefits in the Plan that were invested in AmEx Stock.

9.      The breaching fiduciaries are obligated under ERISA to restore to the Plan the losses resulting from their fiduciary breaches pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).

10.     Because Plaintiff's claims apply to the Participants as a whole, and because ERISA authorizes Participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff brings this as a class action on behalf of all Participants of the Plan during the Class Period.  Plaintiff also brings this action as a Participant seeking plan-wide relief for breach of fiduciary duty on behalf of the Plan.

11.     In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including injunctive relief, constructive trust, restitution, and other monetary relief.

## JURISDICTION AND VENUE

12.     **Subject Matter Jurisdiction**: This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original,

exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).  In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the laws of the United States." 28 U.S.C. § 1331.

13.     **Personal Jurisdiction**: ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are residents of the United States and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

14.     **Venue**: Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because some or all of the fiduciary breaches for which relief is sought occurred in this district.

## THE PLAN

15.     The Plan is an "employee pension benefit plan," as defined by §§ 3(3) and 3(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

16.     The Plan is a "defined contribution plan" or "individual account plan" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34), in that separate individual Plan accounts are maintained for each participant based upon the amount contributed to each participant's account.

17.     The Plan covers all full-time and certain part-time employees of the Company and its participating subsidiaries.  An employee becomes eligible to participate in the Plan as soon as practicable after being hired and is eligible to receive Company contributions upon completion of one year of service.

4

18.     Each pay period, Participants may make before-tax contributions, after-tax contributions (up to 10%), or a combination of both, not to exceed 80% of their compensation to the Plan through payroll deduction. The Company matches 100% of participants' before-tax contributions quarterly up to 5% of compensation upon a participant's completion of one year of service. Effective July 1, 2007, for all eligible Global Business Travel participants, the Company matched 100% of participants' before-tax contributions up to 4% of compensation. Global Business Travel employees are generally those participants employed within the U.S. Business Travel, Global Business Travel and Global Commercial Card businesses who were younger than age 40 on December 31, 2005, or who had less than five years of service on December 31, 2005, regardless of age. A participant must be employed by the Company on the last working day of the quarter to receive Company Matching Contributions.

19.     Prior to July 1, 2007, the Company matched 100% of eligible Participants before-tax contributions up to 3% of compensation and 50% of Global Business Travel employees' before-tax contributions up to 3% of compensation.

20.     Prior to July 1, 2007, upon a Participant's completion of one year of service, in addition to the Company Matching Contributions and Profit Sharing Contributions above, the Company contributed to the Plan on a quarterly basis 1% of each eligible Participant's base salary, regardless of whether the eligible Participant contributed to the Plan. This contribution was initially invested in the American Express Company Stock Fund, but could be immediately moved to another investment offering under the Plan.

21.     Company Stock Contributions were $10,888,448 for 2007. A Participant needed to be employed by the Company on the last working day of the quarter to receive Company Stock Contributions. Effective July 1, 2007, the Company discontinued Company Stock Contributions.

22.   As of the year ended December 31, 2006 the Plan held $975 million of Company Stock, making AmEx Stock the largest investment in the Plan.

23.   The Plan is a legal entity which can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(l).  However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.  Stated differently, Plaintiff seeks relief on behalf of the Plan.

## PARTIES

### Plaintiff

24.   At all relevant times, Plaintiff is and was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. §1002(7) who held investment of Company Stock in her individual Plan account and has suffered losses as a result of the breaches of fiduciary duty alleged in this Complaint.

### Defendant AmEx

25.   AmEx is a New York corporation with its headquarters located at 200 Vesey Street, New York, New York.

26.   AmEx is a payments and travel company, which provides charge and credit payment card products, and travel-related services worldwide.  It operates in two groups, the Global Consumer Group and the Global Business-to-Business Group.  The Global Consumer Group offers a range of products and services including charge and lending card products, consumer travel services, and stored value products, such as Travelers Cheques and prepaid products.  The Business-to-Business Group provides business travel, and corporate cards and other expense management products and services; network services and merchant acquisition,

6

and merchant processing for the company's network partners and proprietary payments businesses; and point-of-sale, back-office, and marketing products and services for merchants. The company also publishes luxury lifestyle magazines.

27.    American Express sells its products and services to various customer groups, including consumers, small businesses, middle-market companies, large corporations, and banking and financial institutions through various channels, such as direct mail, the Internet, employee and independent third party sales forces, and direct response advertising.

28.    The Company's common stock trades on the New York Stock Exchange under the symbol "AXP"

29.    The Plan's annual report on Form 5500 identifies AmEx as the Sponsor of the Plan.

**The Committee Defendants**

30.    The AmEx Board's Compensation and Benefits Committee (the "Compensation Committee") consisted of various officers and employees of the Company who managed the operation and administration of the Plan.

31.    Under the Compensation Committee Charter (as amended and restated as of April 23, 2007), the Compensation Committee "has the authority of the [Board] with respect to . . . . the employee benefit plans of the Company."

32.    The Compensation Committee and its members appointed members of the defendant Benefits Plans Investment Committee which served as a named fiduciary of the Plan.

33.    At all relevant times, Defendant Jan Leschly ("Leschly") was a director of AmEx and served as the chair of the Compensation Committee.

7

34.     At all relevant times, Defendant Richard A. McGinn ("McGinn") was a director of AmEx and served as a member of the Compensation Committee.

35.     At all relevant times, Defendant Edward D. Miller ("Miller") was a director of AmEx and served as a member of the Compensation Committee.

36.     At all relevant times, Defendant Robert D. Walter ("Walter") was a director of AmEx and served as a member of the Compensation Committee.

37.     At all relevant times, Defendant Peter Chernin ("Chernin") was a director of AmEx and served as a member of the Compensation Committee.

38.     At all relevant times, Defendant Employee Benefits Administration Committee ("Administration Committee") was charged with administering the Plan.

39.     The Plan's annual report on Form 5500 identifies the Administration Committee as the Plan Administrator [Form 5500, dated July 23, 2007, Box 3A].

40.     The Plan Administrator is a fiduciary of the Plan.

41.     At all relevant times, defendant Valeria Christensen ("Christensen") was a member of the Administration Committee.

42.     Defendant Christensen signed the Plan's annual report on Form 5500 as the Administrator of the Plan.

43.     Defendant Christensen signed the Plan's annual reports on Form 11-K (filed with the Securities and Exchange Commission (the "SEC") on or about July 15, 2008 and June 29, 2007) on behalf of the Administration Committee.

44.     At all relevant times, defendant Retirement Savings Plan Investment Committee (the "Investment Committee") was a named fiduciary of the Plan and was charged with administering the Plan.

8

45.     The Plan's annual report on Form 11-K for 2007 discloses that the Investment Committee "has the power to select the other investment options available under the Plan and the manner in which certain investments in the Plan are invested."

46.     At all relevant times the Investment Committee had the power to appoint investment managers for the Plan to make investment decisions.

47.     Defendant John Does 1-10 consist of the remaining Defendants who are fiduciaries of the Plan including the other members of the Compensation Committee, the Administration Committee, the Investment Committee, and the Benefit Plans Investment Committee. Because Plaintiff is currently unaware of the true identities and capacities of the remaining Defendants, those individuals are named as John Does 1-10. The John Does, whose real names will be substituted when they are known to Plaintiff, exercised discretionary authority and discretionary control with respect to the management of the Plan and its assets.

## DEFENDANTS WERE FIDUCIARIES OF THE PLAN

48.     During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

49.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(A)(1), 29 U.S.C. § 1102(a)(1). A person is a fiduciary if he is designated a "named fiduciary" under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). Additionally, to the extent that a person is delegated responsibilities under the plan or a procedure specified in the plan, he is a named fiduciary under ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).

50.     A person can also be a de facto fiduciary as a result of his authority or control over the plan under the very broad definition of "fiduciary" set forth in ERISA at § 3(21)(A), 29

9

U.S.C. § 1002(21)(A). A person or entity is a fiduciary where, by his conduct, he engages in fiduciary activities. Thus, those who have discretionary authority over administering or managing the plan or who exercise authority or control over the plan's assets are fiduciaries regardless of the labels or duties that the plan's language assigns to them.

51.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, the Company chose to internalize this fiduciary function. The Plan is administered by the Committee, which has discretionary authority to manage and control the operation and administration of the Plan and investment of its assets.

52.     During the Class Period, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

**Fiduciary Status of the Company**

53.     The Company was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because, the Company through its officers, directors or otherwise, exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets, and is therefore a fiduciary of the Plan. The Company also exercised discretionary authority with respect to the appointment, removal, and, thus, monitoring of other fiduciaries of the Plan that it appointed, or to whom it assigned fiduciary responsibility.

54.     The Company was a fiduciary to the extent that the Board and/or its employees served on the Committees. Upon information and belief, the Committee Defendants were officers and other employees of the Company who served at the pleasure of the Board. Based on these facts, the Company had control over the actions of the Committees and their members and is liable for the Committees' actions.

55.     Throughout the Class Period, the Company had effective control over the activities of its directors, officers and employees, including over their activities related to the Plan. Through the Board or otherwise, the Company had the authority and discretion to hire and terminate said officers and employees. In addition, upon information and belief, the Company had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with respect to the Plan.  Accordingly, the actions of the Committees and/or any other employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

56.     In addition, the Company acted as a fiduciary in connection with the dissemination of Plan communications to the Plan's Participants. The Company made direct representations to Participants relating specifically to the Plan's investment options, the business and financial condition of the Company, and the merits of investing the Plan's assets in Company Stock, and those representations were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plan.

57.     The Company was responsible for disseminating a Summary Plan Description ("SPD") for the Plan to Participants. The Company was also responsible for disseminating to Participants the Plan's prospectus ("Prospectus"), which purported to describe the investment characteristics of the Plan's various investment options. The Prospectus and all information contained or incorporated therein constitute representations disseminated in a fiduciary capacity upon which Participants were entitled to rely in making decisions concerning their benefits and the investment and management of the Plan's assets allocated to their accounts.

58.     Upon information and belief, the Company's filings with the SEC, including but not limited to, annual reports, press releases, Forms 10-K, and Registration Statements, were part

of the SPD and the Prospectus. The Company exercised discretion over the contents of the SPDs and the Prospectuses it disseminated, which were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plan.

59.    Under ERISA, the Company was not required to cause the Plan to offer Company common stock as an investment option under the Plan or to incorporate all of the Company's SEC filings into the Plan's documents, but once it elected to do so, it rendered the disclosures contained in the SEC filings disclosures made in a fiduciary capacity.

**Fiduciary Status of the Individual Defendants**

60.    During the Class Period, the Individual Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

61.    The Individual Defendants are fiduciaries of the Plan in that they issued Plan communications to Plan Participants by signing the Plan's annual reports (including the Forms 5500 and Forms 11-K) and/or by signing the Company's Form 10-Ks that were incorporated into the Plan documents during the Class Period.

**Fiduciary Status of the Committees**

62.    The Company, through its Board, appointed various officers and employees to serve on the Committees that managed the operation and administration of the Plan. The members of the Committees were fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that each member had discretionary authority and control regarding the administration and management of the Plan and/or the Plan's assets, and possessed the full

authority in their absolute discretion to determine all questions of eligibility for an entitlement to benefits under the Plan. The Committees also had the responsibility for selecting, evaluating, monitoring and altering the makeup of the investment alternatives provided under the Plan.

63.   The Individual Defendants and Defendants John Does 1-10 were fiduciaries of the Plan because they were members of the Committees and made statements to Plan Participants and exercised discretionary authority with respect to: (i) managing and administering the Plan; and/or (ii) managing and disposing of the Plan's assets.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

64.   ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions. Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent ... he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets ...." During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

65.   Further, ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants, which includes the duty to speak truthfully to the plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, participants and beneficiaries. Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan's participants will not be injured.

66.     During the Class Period, upon information and belief, Defendants made direct and indirect communications to Participants, which included statements regarding investments in the Company's Stock and statements that were relevant to assessing the risk of investing retirement assets in Company stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions and Prospectuses regarding the Plan's/Participants' holdings of Company common stock), which incorporated and/or reiterated these statements.  These communications were acts of the Plan's administration and Defendants acted as fiduciaries to the extent that they engaged in this activity.

67.     Upon information and belief, Defendants communicated material information necessary for Participants to make informed decisions with respect to the risk of investing retirement assets in Company Stock in the Plan, and in an attempt to comply with ERISA Section 404(a)(1)(A) and (B), Defendants referenced and incorporated Company SEC filings into documents intended to convey information related to the Plan to Participants.  Upon information and belief, the Company's SEC filings were incorporated into Form S-8 registration statements, SPDs, prospectuses and/or other fiduciary communications.

**All of the Defendants Were Co-Fiduciaries**

68.     Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA § 405, 29 U.S.C. § 1105.

## DEFENDANTS' FIDUCIARY DUTIES

69.     ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA, 404(a), 29 U.S.C. § 1104(a).

**The Duty of Prudence**

70.     Section 404(1)(a)(B) imposes on a plan fiduciary the duty of prudence – that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and … with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims …."

**The Duty of Loyalty**

71.     ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries … for the exclusive purpose of … providing benefits to participants and their beneficiaries .

72.     The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye-single" to the interests of the participants and beneficiaries, regardless of any other interests, including those of the fiduciaries themselves or the plan sponsor.

**The Duty to Inform**

73.     The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (i) a duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. These duties recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

74.     Pursuant to the duty to inform, at all relevant times, plan fiduciaries are required under ERISA to furnish certain information to plan participants. For example, ERISA § 101, 29 U.S.C. § 1021, requires the plan's administrator to furnish an SPD to participants. ERISA § 102, 29 U.S.C. § 1022, provides that the SPD and all information contained or incorporated in it constitutes representations in a fiduciary capacity upon which Participants are entitled to rely in determining the identity and responsibilities of fiduciaries under the plan and in making decisions concerning their benefits and the investment and management of plan assets allocated to their accounts.

**The Duty to Monitor Appointed Fiduciaries**

75.     Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries who are appointed. The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries.

**The Duty to Investigate and Monitor Investment Alternatives**

76.     The duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and to continually monitor, the merits of the investment alternatives in the Plan, including employer stock, to ensure that each investment is a suitable option for the Plan.

**The Duty to Disregard Plan Documents When Necessary**

77.     A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result. ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

## CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this action as a class action pursuant to Rule 23(a), (b)(1)(b), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of herself and the following class of persons similarly situated (the "Class"):

> All persons who are Participants in or beneficiaries of the Plan at any time between April 19, 2007 through and including the present, and whose accounts held Company stock or units in the American Express Company Stock Fund (collectively, "Company Stock").

79.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, upon information and belief there are at least thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.   According to the Company's Form 5500, filed with the Department of Labor and the Department of the Treasury for the calendar plan year 2006, the Plan had more than 36,000 participants.

80.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b)     whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's Participants;

(c)     whether Defendants violated ERISA; and

(d)     whether Plaintiff and members of the Class have sustained damages and, if so, what is the appropriate measure thereof.

17

81.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained a diminution of vested benefits arising out of Defendants' wrongful conduct in violation of ERISA as complained of herein.

82.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, ERISA, and complex civil and commercial litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

83.     Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class or parties to the actions, or substantially impair or impede their ability to protect their interests.

84.     Class action status is also warranted under 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

85.     Class action status is additionally warranted under 23(b)(3) because questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## FALSE AND MISLEADING
## STATEMENTS DURING THE CLASS PERIOD

86.     Throughout the Class Period, Defendants misrepresented and failed to disclose the truth about the risk of investing retirement assets in AmEx Stock through the Plan. Defendants misled Participants regarding the overall health of the Company and the risk of investing

retirement assets in AmEx Stock. As a consequence, shares of Company stock traded at artificially inflated prices.

87.     Defendants posted Plan documents, such as the Plan's annual reports, on the Company's Investor Relations website - - http://ir.americanexpress.com - - and also posted other SEC filings on that same site for participants to view, such as the Company's annual and quarterly reports and Forms 8-K which attached press releases during the Class Period.

88.     Those statements falsely represented the fair market value of AmEx's Stock, including the stock held by the Plan, and failed to accurately disclose the risk associated with investing in AmEx Stock because of the significant financial losses that AmEx was experiencing.

89.     At all relevant times it was imprudent to invest the Plan's retirement assets in AmEx Stock given the financial impact on AmEx of the weakening economy, the declines in nationwide consumer credit spending, and AmEx's heavy exposure to losses in its credit business.

### THE TRUTH BEGINS TO EMERGE

90.     On May 2, 2008, AmEx filed a quarterly report with the SEC which acknowledged that its financial growth and earnings for 2008 would be negatively affected because of increased loan losses in the weak economy:

> As expected, in the first quarter of 2008, the U.S. cardmember lending write-off rate rose compared to the fourth quarter of 2007. This write-off rate was higher than the average for the quarter, and therefore the Company expects that these loan loss rates will be higher in the second quarter of 2008 than in the first quarter. In addition, the Company also believes that the combined impact of the Company's credit-related actions in the United States, such as targeted line reductions, slower cardmember spending and the current environmental conditions will likely cause loan growth in the United States to be slower than the growth assumed in the Company's initial plan.

91.     On July 21, 2008, the Company issued a press release entitled "American Express Reports Second Quarter Earnings; Revenues Rise on Higher Cardmember Spending; Earnings Decline as Company Adds to Lending Credit Reserves," announcing that second quarter income from continuing operations dropped 37%, down to $655 million, from $1.0 billion a year ago, and net income also plummeted 38%, down to $653 million for the quarter.

92.     The Company acknowledged that the second quarter results "included a $600 million ($374 million after-tax) addition to U.S. lending credit reserves that reflects a deterioration of credit indicators beyond our prior expectation, and a $136 million ($485 million after-tax) charge to the fair market value of the Company's retained interest in securitized Cardmember loans."

93.     The Company further explained its business decline by stating that:

> Fallout from a weaker U.S. economy accelerated during June with consumer confidence dropping, unemployment rates moving sharply higher and home prices declining at the fastest rate in decades . . . Consumer spending slowed during the latter part of the quarter and credit indicators deteriorated beyond our expectations.
>
> In light of the weakening economy, we are no longer tracking to our prior forecast of 4-6 percent earnings per share growth. That outlook was based on business and economic conditions in line with, or moderately worse than, January 2008. The environment has weakened significantly since then, particularly during the month of June.

94.     On October 20, 2008, the Company issued a press release entitled "American Express Third Quarter Revenues Rise, Earnings Decline on Increased Credit Provisions," reporting additional third quarter declines from a year ago in net income (down 24%), and income from continuing operations (down 23%). AmEx revealed that:

> While we continued to generate a substantial level of earnings this quarter, bottom line results were down from a year ago as growth in

> Cardmember spending slowed, lending volumes moderated, and we
> set aside significant additions to our loan loss reserves.
>
> We saw clear signs earlier this year of a weakening environment
> and the recent volatility in the financial markets has reinforced our
> view that consumer and business sentiment is likely to deteriorate
> further, translating into weaker economies around the globe well
> into 2009.  Cardmember spending is likely to remain soft.   Loan
> growth will be restrained, in part because of the steps we are taking
> to reduce credit risks, and credit indicators are likely to reflect the
> continued downturn in the economy and throughout the housing
> sector.

(Emphasis added).

95.     With respect to its U.S. Card Services Segment, the Company stated that its provisions for losses increased to $941 million, up from $638 million a year ago, "reflecting increased write-off and past due rates driven by the impact of the economic slowdown."

96.     By the close of trading on October 20, 2008, AmEx common stock was down to $24.35 per share from its Class Period price of more than $50 per share.

97.     As an additional sign of how severely AmEx's credit card practices have damaged its financial well-being, the Company announced on October 30, 2008 that it plans to cut 7,000 jobs, or about 10% of its worldwide work force, in an effort to slash costs by $1.8 billion in 2009.

98.     The Company's financial collapse is further evidenced by its November 10, 2008 approval to become a licensed bank-holding company.  AmEx sought "bank-holding" status in order to obtain financing from the Federal Reserve necessary for AmEx to strengthen its weakened position. As a November 11, 2008 Herald Tribune news article entitled "American Express Becomes Bank Holding Company," reported, "when [AmEx's] financing costs soared as the commercial paper markets froze, the company increasingly recognized that it needed to diversify its sources of financing."

99.     Obtaining "bank-holding" status became necessary for AmEx because such status provided AmEx with needed access to the U.S. Treasury's bailout plan for banks.  In fact, as reported in a December 24, 2008 <u>Wall Street Journal</u> article entitled "Treasury Will Invest Billions in AmEx, CIT," AmEx will receive $3.39 billion in aid from the U.S. Treasury from the government's bank bailout fund.

100.    Although the application process for becoming a licensed bank-holding company can take 45 days or longer, AmEx's application was approved in half of that time due to the dire circumstances faced by AmEx's business.  As reported in a November 10, 2008 news article by <u>The New York Times</u> entitled "American Express to Become Bank Holding Company," the Federal Reserve granted AmEx's request to obtain bank-holding status so quickly, claiming that "emergency conditions exist that justify expeditious action on this proposal."

101.    Moreover, a December 19, 2008 <u>MarketWatch</u> news article entitled "S&P Cuts American Express Long-Term Ratings," reported that Standard & Poor's had lowered its long-term ratings on AmEx declaring that "[t]he outlook is negative.  The actions reflect our concerns about the weakening operating environment for consumer lenders, deterioration in AmEx's credit-card loan portfolio and AmEx's wholesale funding."

102.    As the investing public became aware of truth about the Company's problems, the Company's stock price plummeted throughout the Class Period.

103.    By the close of trading on February 5, 2009, AmEx common stock had fallen to a price of $17.03 per share, taking with it the vested retirement assets in the Plan that were invested in AmEx Stock.

104.    The undisclosed adverse information concealed by Defendants during the Class Period is the type of information that, because of SEC regulations, regulations of the national

stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

105.   Upon information and belief, Defendants regularly communicated with Plan Participants about the performance, future financial and business prospects of the Company and its common stock.  Defendants fostered a positive attitude toward the Company's stock and/or allowed Participants in the Plan to follow their natural bias towards investing in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock.  As such, Participants in the Plan were not informed about the true risks presented by investing in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

106.   Indeed, throughout the Class Period, Defendants disseminated to Plan Participants and filed with the SEC annual reports on Form 11-Ks and 10-Ks, and other public statements that were materially false and misleading.  The Plan documents incorporated by reference the Company's false SEC filings.  These and other SEC filings and related statements and releases were inaccurate, incomplete and materially misleading, and reported false financial results, causing the Plan and its Participants to acquire, hold and maintain Plan investments in Company Stock and to invest in Company Stock instead of other, alternative investments in the Plan.

107.   In addition, as fiduciaries responsible for monitoring the investment of Plan assets, Defendants failed to review the performance of the other fiduciaries adequately to ensure that they were fulfilling their ERISA duties.

108.   Defendants, as fiduciaries of the Plan, failed to protect the Plan and its Participants against lost profits and the inevitable diminution in vested benefits.   Consequently, the Plan suffered substantial losses.

**Losses To The Plan And Its Participants**

109.   Unaware about the true risk of investing retirement assets in Company stock through the Plan, or that Defendants' had misrepresented facts that were important to assessing the risk of investing retirement assets in Company stock through the Plan, the Plan's Participants invested substantial amounts of their retirement savings in Company Stock at prices that were artificially inflated.

110.   When investors began to learn the truth about the problems at the Company, the Company's stock price plummeted, taking with it Participant's vested retirement benefits in the Plan.  Because of Defendants' fiduciary breaches, the vested retirement benefits in the Plan have been significantly diminished and impaired.

111.   A prudent fiduciary acting under similar circumstances would have taken reasonable steps to prevent, or at least, minimize the losses sustained by the Plan and to preserve Participant's retirement savings.

112.   In fact, Defendants had available to them several different options for satisfying their fiduciary duty, including: (i) making appropriate public disclosures as necessary; (ii) divesting the Plan of Company stock; (iii) eliminating Company stock as a Plan investment; (iv) investing Plan assets in cash or other alternative investments, including other investments that were available in the Plan instead of in Company Stock; (v) consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Participants of the Plan; or (vi) resigning as fiduciaries of the Plan to the extent that as a result of their

employment by the Company they could not loyally serve Participants in the Plan in connection with the Plan's acquisition and holding of Company stock.

113.   Despite the availability of these and other options, Defendants failed to take appropriate action to protect the Plan or its Participants from lost profits or a diminution of vested benefits as a result of the Plan's investment in Company Stock.

## CLAIMS FOR RELIEF UNDER ERISA

114.   At all relevant times, Defendants were, and acted as, fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

115.   ERISA § 502, 29 U.S.C. § 1132, provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

116.   ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any diminution of vested benefits to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

117.   ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims.  These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law."  They entail, among other things:

> (a)     The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance Company stock, to ensure that each investment is a suitable option for the plan; and

> (b)     A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

118.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> . . . in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(8), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless be makes reasonable efforts under the circumstances to remedy the breach.

119.    Plaintiff therefore brings this action under the authority of ERISA § 502 for Plan-wide relief pursuant to ERISA § 409(a) to recover the lost profits and diminution of vested benefits and other losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants.

## COUNT I

### Failure to Prudently and Loyally Manage the Plan's Assets.
### Breaches of Fiduciary Duties in Violation of ERISA § 404
### (Against All Defendants)

120.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

121.    Defendants were responsible for the selection, maintenance and monitoring of the Plan's investment options, including the option to purchase and to hold investments in Company Stock.

122.    Defendants exercised discretionary authority and/or control over management of the Plan's or disposition of the Plan's assets and were, during the Class Period, responsible for ensuring that investment options made available to Participants were prudent.  Defendants were responsible for ensuring that all investments in Company Stock were prudent, and are liable for losses incurred as a result of such investments being imprudent.

123.    Defendants should have known that throughout the Class Period, the Company was experiencing significant exposure to losses on its credit and loan portfolios and the downturn in the economy.  Defendants should have further known that the Company's failure to disclose its problems artificially inflated the value of the Company's common stock.

124.    Participants invested in Company stock relying on the Company's financial misstatements and omissions and Defendants' continued offering of that stock as an investment option under the Plan.  Because Defendants never fully disclosed adverse, material information to Participants, at the time that Participants made such investments, Participants were without knowledge about the risks of investing in Company stock and about the inaccurate statements and omissions alleged herein which revealed the imprudence of investing in the Company's stock.

27

125.    Defendants breached their duties to prudently and loyally manage the assets of the Plan. During the Class Period, upon the exercise of reasonable care, Defendants should reasonably have known that investment in AmEx common stock was imprudent in that any such investment was unsuitable and inappropriate for either Participant contributions or company matching contributions to the Plan. During the Class Period, Defendants, in violation of their fiduciary duties, continued to offer Company Stock as an investment option for the Plan and to direct and approve the Plan's investment in Company Stock, instead of other investments as permitted by the Plan. Despite the imprudence of any investment in Company stock during the Class Period, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Participants, from suffering substantial losses as a result of the Plan's investment in Company stock.

126.    Defendants breached their duty of loyalty by failing to administer the Plan with single-minded devotion to the interests of the Plaintiff and the members of the Class, regardless of Defendants' own interests.

127.    Defendants breached their fiduciary duties by failing to disclose that they had failed prudently and loyally to manage the assets of the Plan in the exercise of their discretion with respect to Company stock as an investment option in the Plan.

128.    As a direct and proximate result of Defendants' breaches of their fiduciary duties owed to the Plaintiff and the Class, the Plan, and indirectly the Plaintiff and the members of the Class, have been deprived of their full, vested retirement benefits and have suffered losses for which Defendants are liable.

## COUNT II

**Failure to Monitor the Plan and to Provide the Plan Administrator
and Other Fiduciaries with Complete and Accurate Information.
Breaches of Fiduciary Duties in Violation of ERISA § 404**

129.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

130.   By virtue of their fiduciary responsibilities, Defendants were bound to monitor the other fiduciaries and to provide them with information sufficient to perform their duties overseeing the Plan and its investments.

131.   Upon information and belief, Defendants maintained discretionary authority and control with respect to appointing the members of the Committees to manage and evaluate investment of the Plan's assets.  Accordingly, Defendants breached their duties to monitor and inform by:

(a)   Failing to ensure that the Committees and their members, as monitored fiduciaries, had access to knowledge about the Company's exposure to losses and the risks associated with the business problems the Company was experiencing, as alleged above, which made the Company's stock an imprudent retirement investment;

(b)   Failing to ensure that the Committees and their members appreciated the increased risk posed by the significant investment by rank and file employees in Company Stock; and

(c)   Failing to disclose to the Committees accurate information about the operations and financial results of the Company which Defendants reasonably should have known the monitored fiduciaries needed to make sufficiently informed decisions about what investment options the Plan should continue to offer.

29

132.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the members of the Class, suffered losses for which Defendants are liable.

**COUNT III**

**Failure to Provide Complete and Accurate
Information to the Plan's Participants and Beneficiaries.
Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405
(Against All Defendants)**

133.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

134.    During the Class Period, Defendants' fiduciary duties bound them to ensure that communications by and about the Plan and its assets were truthful, complete and not misleading, including information concerning the investment options offered under the Plan and information sufficient for Participants to assess the risk of investing retirement assets in Company stock.

135.    Throughout the Class Period, Defendants failed to provide Plan Participants with complete and accurate information regarding the Company's operations and financial conditions necessary for Plan Participants to accurately assess the quality of an investment in Company Stock.

136.    Instead, Defendants conveyed false and misleading material information to the investing public and to the Plaintiff and the Class, regarding the soundness of Company Stock and the prudence of investing retirement savings in Company Stock. Because large percentages of the Plan's assets were invested in Company Stock during the Class Period, losses therefrom materially affected the value of Participants' retirement assets.

137.    Defendants' misrepresentations and omissions were material to the determination of Plaintiff and members of the Class whether investing in or maintaining their investments in the

Company Stock was prudent. As such, Plaintiff and members of the Class are presumed to have relied to their detriment on Defendants' misleading statements and omissions.

138.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the members of the Class, suffered losses for which Defendants are liable.

**COUNT IV**

**Failure to Act Exclusively in the Interests of the Plan's Participants.**
**Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405**
**(Against All Defendants)**

139.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

140.    Defendants were duty bound to act with undivided loyalties to the Plan, binding them to discharge their responsibilities solely in the interest of Participants and for the exclusive purpose of providing benefits thereto.

141.    Defendants breached their duty of loyalty by:

(a)     Failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in Company Stock;

(b)     Failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transaction which made Company Stock an unsuitable investment for the Plan;

(c)     Failing to take such other steps as were necessary to ensure that the interests of Plaintiff and members of the Class were loyally and prudently served;

(d)     With respect to each of the failures listed in the preceding subparagraphs, Defendants failed adequately to inform Plaintiff and members of the Class to prevent general

31

investors, creditors and others from discovering the Company's financial and operational weaknesses; and

> (e)     By otherwise placing the interests of the Company and themselves above the interests of the Participants with respect to the Plan's investment in Company Stock, by among other things, keeping the Plan's assets heavily invested in Company common stock when it was imprudent to do so, rather than divesting the Plan's investments in Company common stock.

142.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the members of the Class, suffered losses for which Defendants are liable.

## COUNT V

### Co-Fiduciary Liability.
### Breaches of Fiduciary Duties in Violation of ERISA § 405
### (Against the Director Defendants and the Committee)

143.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

144.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

145.    As alleged herein, the Company, through its officers and employees, such as the Director Defendants, and the Committee Defendants failed to provide material information to the Participants and provided misleading disclosures, by the conduct set forth above, and thus, knowledge of such practices is imputed to these Defendants as a matter of law. In addition, as alleged herein on information and belief, the Company and the other Defendants named in this Count participated in and/or knew about the Company's misrepresentations regarding its true financial condition.  Thus, these Defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of Company stock as an investment for the Participants' retirement assets.

146.    Despite this knowledge, the Defendants named in this Count knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's investment and holding of Company common stock during the Class Period.  Defendants did so by themselves making imprudent and disloyal decisions respecting the Plan's investment in Company common stock in the manner alleged herein in violation of ERISA § 405(a)(1)(A).  In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plan's investment in Company stock despite knowing such failures were breaches of fiduciary duty under ERISA.  Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

147.    In further violation of ERISA § 405(a)(1)(C), the Defendants named in this Count also knew that inaccurate and incomplete information had been provided to Participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole.  Instead, they compounded the problem by

downplaying the significance of AmEx's financial problems and further concealing such problems from Participants and the market as a whole.

148.    In addition, the Defendants named in this Count enabled the imprudent asset management decisions of any and all other Defendants - including any appointed fiduciaries of the Plan - who lacked knowledge of the circumstances rendering Company common stock imprudent, by failing to provide such persons with complete and accurate information regarding Company common stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan caused by the Company's business problems and losses, so that these other Defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in Company common stock.  In so doing, these Defendants breached ERISA § 405(a)(1)(B).

149.    Further, through their failure to properly and effectively monitor their appointees on the Committees, and remove those fiduciaries whose performance was inadequate as alleged above, the Defendants named in this Count enabled these appointed fiduciaries' imprudent management of the Plan's investment in Company Stock.

150.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants, lost a significant portion of their retirement investment.

151.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.    A declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plan and its Participants;

B.    An Order compelling Defendants to (i) make good to the Plan all diminution of vested benefits to the Plan and all lost profits to the Plan resulting from Defendants' breaches of their fiduciary duties and (ii) to restore to the Plan any profits Defendants made by breaching their fiduciary duties;

C.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched as the result of breaches of fiduciary duty;

D.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.    An Order that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in Company stock or units maintained by the Plan in proportion to the account's diminution of vested benefits attributable to the decline in the price of Company stock and units in the Plan;

F.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.     An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

Dated: February 10, 2009

SQUITIERI & FEARON, LLP


By:_____
        Stephen J. Fearon, Jr. (SF-8119)
        Lee Squitieri (LS-1684)
32 East 57th Street, 12th Floor
New York, New York 10022
Tel:  (212) 421-6492
Fax:  (212) 421-6553
Email: stephen@sfclasslaw.com

MAJOR KHAN LLC
Major Khan
20 Bellevue Street
Weehawken, NJ 07086
Tel: (646) 546-5664
Fax: (646) 546-5755
Email: mk@mk-llc.com

*Attorneys for Plaintiff*